CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MORRIS, JUETTEN, and MURDOUGH
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant LARRY F. QUINTANILLA**
**United States Army, Appellant**

ARMY 20240216

Headquarters, 1st Cavalry Division
Michael Friess, Military Judge
Lieutenant Colonel Allison D. McFeatters, Staff Judge Advocate

For Appellant: Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Robert W. Rodriguez, JA; Major Robert W. Duffie, JA (on brief).

For Appellee: Colonel Richard E. Gorini, JA; Major Stephen L. Harmel*, JA; Captain Matthew C. Whear, JA (on brief).

18 November 2025

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

MURDOUGH, Judge:

An enlisted panel convicted appellant, contrary to his pleas, of a single specification of domestic violence by commission of a violent offense, in violation of Article 128b, Uniform Code of Military Justice, 10 U.S.C. § 928b [UCMJ] (incorporating by reference Article 128, 10 U.S.C. § 928). The military judge sentenced him to be confined for 45 days. This case is before us on appeal pursuant to Article 66(b)(1), UCMJ.[1]

---

*Corrected

[1] We note an error in the court-martial convening orders [CMCOs] that convened appellant's court martial. The record includes three convening orders issued by this

(continued . . .)

Appellant asserts two errors, first that his conviction is factually insufficient and second that the military judge erred when he admitted, over appellant's objection, certain statements of the victim under the "medical hearsay" exception of Mil. R. Evid. 803(4).

We reiterate fundamental principles of law. The "medical hearsay" exception can apply to statements made to a variety of actors, not merely medical personnel. And circumstantial evidence can be sufficient to establish guilt beyond a reasonable doubt. For these reasons, appellant's two assignments of error merit discussion but not relief.[2]

## BACKGROUND

### A. The altercation

At the time of the offense, appellant and the victim, his wife, were married but living separately; his wife continued to live in their on-post residence with their children. They had discussed a divorce but had not yet completed the formal process. Occasionally, appellant would come over to the house to spend time with the children.

-------

(. . . continued)

headquarters: CMCO #1, dated 10 January 2024, CMCO #6 (corrected copy), dated 23 April 2024, and CMCO #7 dated 25 April 2024. However, the text of CMCO #6 (corrected copy) and the trial counsel's announcement on the record indicate that the date of the original CMCO #6 was 16 April 2024. As we previously noted in *United States v. Jones*, ARMY 20210623, 2023 CCA LEXIS 124 (Army Ct. Crim. App. 2023) (summ. disp.), convening orders follow the requirements of Army Regulation 600-8-105, which states that the date of a "corrected copy" is the date of the original order, unless the date itself is the correction. Thus, the correct date for CCMO #6 (corrected copy) would be 16 April 2024. Again, as we held in *Jones*, this is an administrative error that did not deprive the court of jurisdiction and did not in this case prejudice the appellant. We nonetheless take this opportunity to remind all responsible for the administration of military justice to pay close attention to the details of convening orders, as a properly-convened court is a prerequisite for jurisdiction. *See* R.C.M. 201(b)(1).

[2] We have given full and fair consideration to the issue the appellant personally submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and we determine it merits neither discussion nor relief.

On one Saturday, appellant stayed the night at the house with his wife. They had made plans to have dinner the next day, Easter Sunday, with their children and their neighbors. They slept together and during the night, appellant gave his wife at least one "hickey"[3].

While appellant was still sleeping, his wife woke up and searched through appellant's phone, looking for evidence of infidelity. Believing she had found what she sought, she woke appellant by pushing and slapping him. After he awoke, they argued verbally. A physical struggle ensued over the phone, and she eventually gave it to him.

### A. The aftermath

Following the struggle, appellant went to the living room. The victim took one of her children and ran to the neighbors' house. She arrived visibly distraught. With her neighbor's assistance and encouragement, she called 911; during the call, she told the 911 operator words to the effect that "my husband just hit me and choked me" and that she "couldn't breathe."[4]

Medical personnel arrived in an ambulance and evaluated and treated the victim on-site. She told an emergency medical technician (EMT) substantially the same thing, that her husband had hit and "choked" her. Law enforcement arrived at about the same time and took several photographs of injuries to her face and neck. They arrested appellant on the scene. The victim declined transportation to a hospital for further medical treatment.

In the following days, law enforcement took additional photographs of the victim's injuries. She also spoke multiple times with law enforcement, initially requesting to stay anonymous but eventually submitting to a video-recorded interview. She would testify later that she felt like she had no choice.

### C. Trial

Appellant was charged with two specifications of domestic violence for the events of that night, first alleging that he strangled the victim, and in the alternative, that he committed a violent offense by unlawfully grabbing her neck. Before trial,

---

[3] The term "hickey" is defined as "a temporary red mark or bruise on the skin (such as one produced by biting and sucking)." MERRIAM-WEBSTER, *hickey*, https://www.merriam-webster.com/dictionary/hickey (last visited Nov. 7, 2025).

[4] The victim also told the 911 operator that her husband "threatened to kill [her]." As discussed further *infra,* the military judge excluded this information, and it was never put before the members.

the government moved *in limine* for a preliminary ruling on the admissibility of, *inter alia,* the victim's statements to the 911 operator and the EMT. The military judge denied the government's request for a pretrial ruling and deferred ruling on the admissibility of the statements until trial.

At trial, the victim testified about the sex and the searching through and struggle over appellant's phone. She did not testify that appellant ever touched her neck with his hands.[5] She refused the trial counsel's offers to refresh her recollection with prior statements. The trial counsel then tried again:

> Q. I'm having a hard time....you just have no memory?
>
> A. I mean, I told you that everything calmed down and he was sitting in the living room and I ran off that was after the incident, too.
>
> Q. So what was the incident?
>
> A. Some disagreement, I don't know it was over the phone I remember.
>
> Q. Did he lay hands on you?
>
> A. I don't know, I don't remember.
>
> Q. You don't know? Probably?
>
> A. That's what we're here for, *that's what I said.* (emphasis added)
>
> Q. How did he lay hands on you?
>
> A. I don't remember.

Through the testimony of the victim and of law enforcement agents, the government authenticated and admitted the photographs of the victim's injuries taken that night and in the successive days.

The government tried repeatedly to offer a multitude of the victim's out of court statements under a variety of evidentiary theories, including excited utterance,

---

[5] On cross-examination, she testified that he had given her a hickey on her neck.

statements made for medical diagnosis or treatment, and recorded recollection.[6] The defense objected every time the government offered these statements. The military judge denied all government efforts to introduce the victim's prior statements, except certain statements under the "medical hearsay exception."

In an Article 39(a) session, the military judge heard argument and reviewed a document provided by the defense labeled "911-Call Transcript," which the Government agreed accurately reflected the victim's 911 call. After a recess, he ruled orally that four statements of the victim were admissible as medical hearsay, though he limited the government's presentation of the evidence to the testimony of the 911 operator and did not allow the government to present the actual recording. Similarly, the military judge allowed the EMT to testify to a portion of the conversation she had with the victim, as well as her direct observations of the victim's appearance and demeanor, but did not allow the government to introduce the EMT's written report.

Pursuant to this ruling, both the 911 operator and EMT were permitted to testify that the victim said words to the effect of "my husband choked me."[7] Each side also called a nurse to testify as an expert witness, and both sides' experts acknowledged that lay people often use the word "choking," which is an internal obstruction of the airway, when they really mean "strangling," which is an external application of pressure to the neck. Both sides' experts admitted that the documented marks on the victim's neck could be consistent with either strangulation or with suction injuries, i.e. hickeys. The government's expert opined that they were more likely signs of strangulation; the defense's expert opined that they were more likely hickeys.

The military judge instructed the members on both self-defense and the defense of property, specifically appellant's phone. The members convicted the appellant of domestic violence by grabbing the victim's neck but acquitted him of the parallel specification alleging that he strangled her.

## LAW AND DISCUSSION

We address the appellant's two assignments of error in reverse order, because our decision on the second issue informs our decision on the first.

---

[6] Mil. R. Evid. 803(2), 803(4), and 803(5).

[7] The government's first attempt to elicit this line from the 911 operator met with a sustained objection from the defense. The admitted testimony from the 911 operator was, "The injury itself specifically . . . was he had hit her; he had choked her. She was having trouble breathing." The admitted testimony from the EMT was, ". . . she had been in an argument and that her husband had slapped her and choked her . . . he choked me to the point where I could not breathe."

*A. The Military Judge's Application of the Medical Hearsay Rule*

We review a military judge's decision to admit or exclude evidence for abuse of discretion. *United States v. Greene-Watson,* 85 M.J. 340 (C.A.A.F. 2025) (citing *United States v. Wilson,* 84 M.J. 383, 390 (C.A.A.F. 2024)). A military judge abuses his discretion if (1) his findings of fact supporting the ruling are not supported by evidence of record, (2) he uses incorrect legal principles, or (3) he applies correct legal principles in a clearly unreasonable manner. *Id.*

Under Military Rule of Evidence 803(4), commonly referred to as the "medical hearsay" exception, a hearsay statement is admissible evidence when it "(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause."

The military judge reviewed the victim's statements to the 911 operator and found that four of them fell under this exception: 1) "that her husband just hit her [and] choked her . . . . [8] and that she needs help. She can't breathe, her asthma [or words to that effect];" 2) "when asked if she needed medical attention, she said, 'yes, I can't breathe[;]'" 3) "when asked again about her inability to breathe, she stated 'yes,' that it might be from running and that she has asthma;" and 4) "when asked if she has any injuries from her husband, she stated 'yes' . . . they were on her neck and face." The military judge found that the victim made these statements for the purpose of receiving medical treatment and that they were reasonably pertinent to medical treatment; he added that the context of the call indicated that the victim's requests for help indicated an expectation of receiving medical treatment. He also found that these statements described medical history, past or present symptoms or sensations, and their general cause. The record supports these findings of fact.[9]

---

[8] The military judge initially included "and threatened to kill her" in the body of admissible evidence, but later clarified his ruling that he was not allowing testimony from either the EMT or the 911 operator that the appellant threatened to kill her. The appellant was initially charged with violating Article 131b for communicating this threat to the victim. The exclusion of this evidence later resulted in a finding of not guilty pursuant to R.C.M. 917 for this charge and specification.

[9] The government sought to admit a disc containing the recorded audio of the call. The military judge based his findings of fact on a document, marked for identification as a defense exhibit, that purported to be a transcript of the 911 call. This document is not authenticated or certified in any way and from context, it appears to have been prepared by the defense team. While the government agreed that the "transcript" was sufficiently accurate, it does not appear from the record

(continued . . .)

Similarly, during the EMT's direct examination, the military judge again held an Article 39(a) session to consider the admissibility of portions of the EMT's report, in which she had recorded statements made by the victim. After hearing argument, he allowed the government to elicit portions of the victim's statements that he found met the medical hearsay exception, and, prior to the return of the members, he instructed the witness to avoid testifying about certain matters he had ruled inadmissible. For both witnesses, the military judge limited the government's presentation of evidence to questions and answers and denied the government's requests to admit any extrinsic evidence of the victim's statements, either the 911 call or the printed EMT report.[10]

In his ruling, the military judge chiefly relied on *United States v. Cucuzella,* 66 M.J. 57 (C.A.A.F. 2008). In *Cucuzella,* our superior court surveyed prior case law applying the medical hearsay exception and noted that the exception can apply to "persons outside the medical profession, who perform health care functions and receive statements for the purpose of medical diagnosis." *Id.* at 59 (citations omitted).[11] The court further noted that the question of the declarant's state of mind in making the statement, i.e. the purpose or expectation with which it is made, is a question of fact for the trial judge and, thus, the trial judge's factual determination will only be set aside if clearly erroneous. *Id.* at 60 (citations and internal quotations omitted). The subjective state of mind of the declarant is a key factor. *Id.*

---

(. . . continued)

that the military judge listened to the actual recording that had been offered into evidence. Having reviewed both the "transcript" and the recording, we note that while the "transcript" contains minor inaccuracies, they do not affect the judge's essential findings of fact, and thus we conclude he did not abuse his discretion. Nonetheless, trial judges are expected to consider the actual exhibit offered, not merely what counsel say about the exhibit, when ruling on questions of admissibility. *See United States v. Finch,* 79 M.J. 389 (C.A.A.F. 2020) (military judge erred when he admitted the entirety of a video recording without looking at it).

[10] He based these portions of his rulings in part on Military Rule of Evidence 403. We find his articulation and application of Rule 403 appropriately within his discretion.

[11] *Cucuzella* applied the text of the rule as it existed at the time. In 2013, the text of military rule of evidence 803(4) changed consistent with a corresponding change in its federal counterpart. Military Rule of Evidence 803(4); Executive Order 13,643, 78 Fed. Reg. 98, 29559 (May 21, 2013) [Exec. Order 13,643]. The change was stylistic and did not change the substance of the rule. *See* Fed. R. Evid. 803, advisory committee's note to 2011 amendments.

The military judge applied correct legal principles to findings of fact supported in the record, and he did not do so in a clearly unreasonable manner. Even though statements were made to a 911 operator, not a medical provider, the victim's requests for help demonstrated her expectation of receiving medical treatment. And the limited scope of the admitted statements, including statements by the victim that her husband had choked her, encompassed only past or present symptoms or sensations and their inception or general cause. Further, the statements were reasonably pertinent to the provision of medical treatment. Her statements to the EMT in the course of an initial medical response and assessment are even more clearly within the scope of this exception.

The military judge did not abuse his discretion. The victim's statements, relayed through the testimony of two witnesses, that her husband had "choked" her, as well as the other statements introduced through testimony, were properly admitted and constituted competent evidence for the members' consideration.

*B. Factual sufficiency*

Appellant argues that his domestic violence conviction is factually insufficient because the victim was an unreliable witness who was motivated to fabricate and unwilling to participate or recant. He also asserts that the evidence does not disprove self-defense or defense of property, and the expert evidence weighs in his favor. We disagree; even with a flawed witness and affording less deference to the panel, the evidence is still factually sufficient to affirm his conviction.

We review factual sufficiency of a conviction under Article 66(d)(1)(B):

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.
>
> (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>
> (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was

against the weight of the evidence, the Court may dismiss,
set aside, or modify the finding, or affirm a lesser finding.

If the "trigger conditions" (assertion of error and showing of deficiency) are met, we may review for factual sufficiency. To be "clearly convinced" that the finding was against the weight of the evidence, we must decide that the evidence as we weigh it does not prove that the appellant is guilty beyond a reasonable doubt, and we must be clearly convinced of the correctness of this decision. *United States v. Harvey*, 85 M.J. 127, 132 (C.A.A.F. 2024).

### 1. *Evidence supporting the conviction*

The specification of which the appellant stands convicted alleged that he committed domestic violence by committing assault consummated by a battery. The elements of that predicate offense are that (1) he did bodily harm to the victim, by grabbing her neck with his hand; (2) that the bodily harm was done unlawfully; and (3) that the bodily harm was done with force or violence.[12]

The degree of deference we give to the trial court depends on the nature of the evidence at issue. *Id.* at 131; *accord United States v. Downum*, __ M.J. __, 2025 CAAF LEXIS 828, at *13 (C.A.A.F. 23 Oct. 2025) (noting that the "level of deference owed by a service court to certain factual determinations by the trial court . . . ." will depend on the type of evidence presented at trial). For example, when the nature of the evidence is primarily witness testimony, we may give greater deference to the trial court that actually heard and saw the witnesses testify. *See United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015), aff'd 76 M.J. 224 (C.A.A.F. 2017); *Harvey*, 85 M.J. at 131 ("a [court of criminal appeals] might determine that the appropriate deference required for a court-martial's assessment of the testimony of a fact witness . . . is high because the CCA judges could not see the witness testify."). On the other hand, if the evidence is primarily documentary evidence, we might give less deference because we can view it for ourselves.

In this case, appellant asserts that the victim's in-court testimony was demonstrably unreliable, primarily due to large gaps in her memory—she explicitly refused to testify that the charged act even occurred. But a fundamental principle of law is that the government may meet its burden of proof through both direct and circumstantial evidence. *E.g. United States v. Mendoza*, 85 M.J. 213, 217-18 (C.A.A.F. 2024) (citations omitted); R.C.M. 918(c).

---

[12] The other element of domestic violence, that at the time the victim was the appellant's spouse, was not in dispute at trial nor is it in dispute on appeal.

We give weight to the victim's two near-simultaneous statements that her husband "choked her," which she made with the expectation of receiving medical treatment.[13] The premise of the medical hearsay exception is that the declarant is incentivized to be truthful because the statement enables medical professionals to provide proper treatment or promote the declarant's well-being. *Cucuzella*, 66 M.J. at 59. And we can accept for ourselves the uncontradicted expert testimony that lay people often misuse "choked" when they really mean "strangled," i.e. applying force to the neck.

Though we can view the photographs of the victim's injuries to her neck for ourselves, we—like the court members—must rely on specialized expert knowledge to understand the source and significance of these injuries. The members weighed this dueling expert testimony and were persuaded that the documented injuries to the victim's neck were not hickeys, but rather appellant caused them by grabbing her neck with his hands. In this area, with comparably-qualified experts who offered divergent opinions, we do give greater deference to the members who heard and saw these experts testify.

With this quantum of circumstantial evidence, giving appropriate levels of deference to the trier of fact, we are not clearly convinced that this finding was against the weight of the evidence.

### 2. Self-defense and defense of property

Both self-defense and defense of property are defenses against assault consummated by a battery, and by extension domestic violence as it was alleged in the specification for which the appellant is convicted. Self-defense requires that the accused apprehended, on reasonable grounds, that bodily harm was about to be inflicted wrongfully on him and that he subjectively believed the force used was necessary to protect against that bodily harm. R.C.M. 916(e)(3).[14] Similarly, defense of property requires that the accused reasonably believed his real or personal property was in immediate danger of trespass or theft, and the accused must have subjectively *and reasonably* believed the force used was necessary to prevent loss of the property. *United States v. Davis,* 73 M.J. 268, 272 (C.A.AF. 2013).

Owing to the victim's professed memory gaps and the dearth of other evidence in the record, the sequence and chronology of events after she woke

---

[13] In performing our factual sufficiency review, we consider only the evidence put before the members, i.e. the testimonies of the EMT and the 911 operator, not the extrinsic evidence that was offered but not admitted.

[14] Provided that the force used is less than that reasonably likely to produce death or grievous bodily harm. Based on the findings of the trial court, that is not at issue in this case.

appellant until they both left the room are unclear. However, her only *direct* attack on appellant's person was while he was still asleep. Once he woke, the argument and physical struggle centered on the phone. The only physical resistance the victim offered was to retain the phone. The evidence sufficiently establishes that appellant did not reasonably apprehend harm to his person was imminent, such that he subjectively believed it was necessary to grab her neck.

Turning to defense of property, unlike self-defense, appellant's subjective belief in the force necessary to defend his property must also be reasonable. *Davis, supra.* The evidence shows he inflicted multiple injuries to the victim's neck that were still visible days later, which testimony about a hickey did not reasonably explain. Even if he subjectively believed retaining his phone required hurting the victim to this degree, such belief was not reasonable under these circumstances.

The evidence sufficiently disproves both self-defense and defense of property; we are again not clearly convinced that the finding of guilty was against the weight of the evidence on these issues.

## CONCLUSION

Upon consideration of the entire record, the findings of guilty and the sentence are AFFIRMED.

Senior Judge MORRIS and Judge JUETTEN concur.

FOR THE COURT:



//JAMES W. HERRING, JR.
Clerk of Court